*This opinion is subject to revision before final publication in the Pacific Reporter*

**2016 UT 16**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

CLEARONE, INC.,
*Appellant,*

*v.*

REVOLABS, INC.,
*Appellee.*

No. 20141184
Filed April 1, 2016

On Direct Appeal

Third District, Salt Lake
The Honorable Judge Kate A. Toomey
Case No. 140905197

Attorneys:

James E. Magleby, Christine T. Greenwood, Jennifer Fraser Parrish,
Kennedy Davis Nate, Salt Lake City, for appellant

Steven W. Dougherty, Andrew R. Hale, Salt Lake City, for appellee

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
ASSOCIATE CHIEF JUSTICE LEE, JUSTICE DURHAM,
and JUSTICE HIMONAS joined.

JUSTICE JOHN A. PEARCE became a member of the Court on
December 17, 2015, after oral argument in this matter, and
accordingly did not participate.

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶ 1 This case presents us with the opportunity to review and apply the United States Supreme Court's recent cases on both specific and general personal jurisdiction. The question is whether

Revolabs, a corporation incorporated in Delaware with its principal place of business in Massachusetts, is subject to either specific or general personal jurisdiction in Utah. The underlying dispute arose when Revolabs allegedly interfered with ClearOne's contractual relationship with Timothy Mackie by recruiting and hiring him while he was still employed by ClearOne. ClearOne brought suit against Revolabs, asserting claims of intentional interference with a contractual relationship, predatory hiring, and aiding and abetting a breach of fiduciary duty. The trial court granted Revolabs's motion to dismiss for lack of personal jurisdiction, which ruling ClearOne now appeals. After a review of the United States Supreme Court's personal jurisdiction jurisprudence, we conclude that Revolabs has insufficient contacts with Utah to subject it to jurisdiction here and affirm.

## Background

¶ 2 Plaintiff ClearOne is a Utah corporation that designs, develops, and sells audio-visual equipment, with its principal place of business in Utah.[1] Defendant Revolabs is a competitor that is incorporated in Delaware with its principal place of business in Massachusetts. Mr. Mackie is a former employee of ClearOne who worked for ClearOne in a technical sales position from November 2009 to September 2013. In December 2009, Mr. Mackie entered into a Confidentiality, Non-Competition, and Invention Assignment Agreement with ClearOne. This employment contract included provisions preventing Mr. Mackie from competing with ClearOne during his employment and for one year after the employment ended and prohibiting him from soliciting ClearOne customers for the same one-year period. There were also a number of other provisions relating to the confidentiality of customer information and trade secrets. Both the contract and the fiduciary duties owed by Mr. Mackie to ClearOne were to be performed, at least in part, in Utah and were governed by Utah law. Mr. Mackie resided in Texas

---

[1] As this is an appeal from the dismissal of the case under rule 12(b)(2) of the Utah Rules of Civil Procedure, "we must 'accept the factual allegations in the complaint as true and consider all reasonable inferences to be drawn from those facts in a light most favorable to the plaintiff.'" *Ho v. Jim's Enters., Inc.*, 2001 UT 63, ¶ 6, 29 P.3d 633 (citation omitted). The recitation of the facts complies with this standard.

during these events, and the only allegations as to where Mr. Mackie performed his work for ClearOne indicates that he worked in Texas.

¶ 3 In August 2013, Mr. Mackie, while still residing in Texas, contacted individuals at Revolabs about leaving ClearOne to work for Revolabs. Over the next several weeks, Mr. Mackie communicated with several individuals about this potential transition through calls, video chats, and emails. These individuals included: Curtiss Singleton, Revolabs's director of sales for the Americas, who was located in Georgia; Marc Cremer, Revolabs's chief operating officer, who was located in Massachusetts; Daniel Kleman, Revolabs's field sales engineer for its western region, who was located in California; and Jonathan McGarry, Revolabs's field sales engineer for its eastern region, who was located in Massachusetts. After several discussions and interviews, Mr. Cremer offered Mr. Mackie a position at Revolabs on September 3, 2013, which Mr. Mackie accepted. Mr. Mackie executed an employment and confidentiality agreement with Revolabs on September 6, 2013, and tendered his resignation to ClearOne on September 9, 2013, stating that his last day would be September 20, 2013. Mr. Mackie began working for Revolabs on September 23, 2013. No part of these events took place in Utah.

¶ 4 On December 19, 2013, ClearOne filed suit against Mr. Mackie in Utah district court for, *inter alia*, breach of the employment agreement, which litigation remains pending in a separate action. After learning of Revolabs's involvement with and encouragement of Mr. Mackie's resignation, ClearOne filed suit against Revolabs in Utah district court on July 30, 2014. ClearOne sought damages and an injunction for Revolabs's alleged tortious interference with Mr. Mackie's employment contract, predatory hiring under the Utah Unfair Competition Act, and aiding and abetting Mr. Mackie's alleged breach of his fiduciary duties to ClearOne.

¶ 5 Prior to discovery being conducted, Revolabs filed a motion to dismiss under Utah Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. ClearOne opposed the motion and filed its own motion seeking jurisdictional discovery in order to determine whether Revolabs should be subject to general jurisdiction in Utah. As evidence in support of its claim that Revolabs had systematic and continuous contacts with Utah, ClearOne pointed to Revolabs's publicly accessible website; the fact that Revolabs is included in an online directory of Utah businesses maintained by the Utah Department of Workforce Services (though the site states that Revolabs currently has no employees in Utah); and a bid solicitation

by Utah Valley University for audio-visual equipment, including equipment sold by Revolabs. Revolabs responded to this evidence with an affidavit stating that it "does not maintain or conduct any business operations in the state of Utah and does not direct any advertising into Utah; it has no offices in Utah, owns no property in Utah[,] and maintains no employees in Utah." ClearOne has not disputed this statement. The trial court denied ClearOne's request for discovery and granted Revolabs's motion to dismiss. ClearOne appealed the trial court's decision.

## Standard of Review

¶ 6   ClearOne raises two claims on appeal: first, the trial court erred in dismissing Revolabs for lack of specific personal jurisdiction. "[T]he propriety of a 12(b)(2) dismissal is a question of law, [and] we give the trial court's ruling no deference and review it under a correctness standard."[2] Second, the trial court erred in denying discovery to determine whether Revolabs was subject to general personal jurisdiction in Utah. We review the trial court's decision on this issue for abuse of discretion.[3] We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(j).

## Analysis

¶ 7   "The authority of the state to hale a nonresident into a state court hinges on the ability to establish personal jurisdiction."[4] And a court's exercise of personal jurisdiction over a party must be "consistent with the due process protections of the Fifth and Fourteenth Amendments to the United States Constitution."[5] There

---

[2] *Ho v. Jim's Enters., Inc.*, 2001 UT 63, ¶ 6, 29 P.3d 633 (citation omitted).

[3] *See Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1326 (10th Cir. 2002).

[4] *Pohl, Inc. of Am. v. Webelhuth*, 2008 UT 89, ¶ 9, 201 P.3d 944.

[5] *Osborne v. Adoption Ctr. of Choice*, 2003 UT 15, ¶ 20, 70 P.3d 58. The exercise of jurisdiction must also satisfy our long-arm statute. *See Anderson v. Am. Soc'y of Plastic & Reconstructive Surgeons*, 807 P.2d 825, 827 (Utah 1990). Because "our legislature has directed us to construe [the long-arm statute] 'so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause,'" and as the parties have not argued over the applicability of the statute, we can "assume the application of the

(Continued)

are two categories of personal jurisdiction, specific and general jurisdiction, both of which are implicated in this case.[6] ClearOne first argues that the trial court erred in dismissing Revolabs for lack of specific personal jurisdiction. Alternatively, ClearOne claims that the court abused its discretion by denying ClearOne the opportunity to conduct discovery in order to determine whether Revolabs should be subject to general personal jurisdiction. Below, we discuss these two issues in turn and affirm.

## I. Revolabs Is Not Subject to Specific Personal Jurisdiction in Utah

¶ 8 "[S]pecific personal jurisdiction gives a court power over a defendant only with respect to claims arising out of the particular activities of the defendant in the forum state . . . ."[7] The United States Supreme Court has interpreted the Due Process Clause of the Fourteenth Amendment to permit a state to exercise specific personal jurisdiction over a party only when the party has "minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"[8] "In judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'"[9] The Supreme Court recently clarified the kind of contacts with a state that satisfy this test in *Walden v. Fiore*.[10] We first address *Walden* and its impact on the "effects" test derived from the Supreme Court's decision in *Calder v. Jones*. In so doing, we recognize that the Supreme Court has rejected a particular approach to the minimum contacts test, which limits our decision in *Pohl, Inc. of America v. Webelhuth*. We then apply the principles found in *Walden* to the present case, which lead us to the conclusion that the trial court was correct in dismissing Revolabs for lack of personal jurisdiction.

---

statute[ ]and go straight to the due process issue." *Id.* (citation omitted).

[6] *See Pohl*, 2008 UT 89, ¶ 9.

[7] *Pohl, Inc. of Am. v. Webelhuth*, 2008 UT 89, ¶ 10, 201 P.3d 944 (alteration in original) (citation omitted)

[8] *Int'l Shoe Co. v. Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (citation omitted).

[9] *Calder v. Jones*, 465 U.S. 783, 788 (1984) (citation omitted).

[10] 134 S. Ct. 1115 (2014).

*A.* Walden *Narrowed the Broad Interpretation of* Calder
*Adopted in* Pohl

¶ 9   ClearOne relies almost exclusively on our 2008 decision in *Pohl, Inc. of America v. Webelhuth* in support of its argument that Revolabs is subject to specific personal jurisdiction in Utah. *Pohl* in turn relied on a 1984 Supreme Court case, *Calder v. Jones*. The initial issue raised by the parties is whether the Supreme Court's decision in *Walden* altered or clarified *Calder* such that *Pohl*'s interpretation of *Calder* is no longer good law. Below, we address each case in the order it was decided and conclude that *Walden*, while not overruling *Calder*, significantly altered the interpretation of *Calder* that supported our decision in *Pohl*. Accordingly, the broad interpretation of the "effects" test derived from *Calder* and adopted by us in *Pohl* has been narrowed by *Walden*.

1. *Calder v. Jones*

¶ 10 In *Calder v. Jones*, the Supreme Court was called on to decide whether two individuals, a reporter and an editor employed by the *National Enquirer* magazine, were subject to specific personal jurisdiction in California for their part in writing and editing an allegedly defamatory article.[11] The relevant contacts linking the defendants to California were that the *Enquirer* circulated about 600,000 copies in California, and "[t]he allegedly libelous story concerned the California activities of a California resident," "impugned the professionalism of an entertainer whose television career was centered in California," and "was drawn from California sources."[12] Further, "the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California."[13] "In sum, California [was] the focal point both of the story and of the harm suffered."[14] The Supreme Court accordingly held that jurisdiction was "proper in California based on the 'effects' of their Florida conduct in California."[15]

---

[11] *Calder*, 465 U.S. at 784–86. The article suggested that the respondent, Shirley Jones, drank so heavily that it interfered with her obligations as a television entertainer. *Id.* at 788 n.9.

[12] *Id.* at 785, 788–89.

[13] *Id.* at 789.

[14] *Id.*

[15] *Id.*

¶ 11 As the Ninth Circuit has noted, "[s]ubsequent cases have struggled somewhat with *Calder*'s import," as the "effects" language does not clarify how foreseeable the effects must be or to what degree the effects must impact the plaintiff or the forum state in order to give rise to specific jurisdiction.[16] One interpretation of *Calder* is a minimum contact analysis known as the "effects" test.[17] This test has three prongs: "the defendant must have (1) committed an intentional act, which was (2) expressly aimed at the forum state, and (3) caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state."[18] It was this "effects" test, interpreted broadly, that we relied upon in *Pohl* to reverse the trial court's determination that jurisdiction was improper.[19]

2. *Pohl, Inc. of America v. Webelhuth*

¶ 12 *Pohl* involved a construction project in Missouri overseen by a Missouri general contractor.[20] Pohl, a Utah corporation, was contracted to manufacture and supply panels to be installed on the exterior of the building.[21] Disputes arose over the "production, delivery, and payment schedule for the panels," leading to Pohl's contract being terminated.[22] Pohl sued the general contractor and various other subcontractors and individuals, all of whom were based in Missouri, alleging that they had conspired to interfere with

---

[16] *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000).

[17] At least "two primary tests have emerged" from *Calder*: a "restrictive view" that requires proof "that the defendant target[ed] the forum state, not merely a forum resident," and a "broad view," which only requires proof "that the defendant target[ed] a plaintiff known to reside in the forum state." Lee Goldman, *From* Calder *to* Walden *and Beyond: The Proper Application of the "Effects Test" in Personal Jurisdiction Cases*, 52 SAN DIEGO L. REV. 357, 365–66 (2015). The Ninth Circuit's "effects" test, which is the approach we adopted in *Pohl*, is the "broad view." *Id.* at 366.

[18] *Bancroft & Masters*, 223 F.3d at 1087.

[19] *See* 2008 UT 89, ¶¶ 25–30.

[20] *Id.* ¶ 3.

[21] *Id.*

[22] *Id.* ¶ 4.

Pohl's contract.[23] The district court dismissed the defendants for lack of personal jurisdiction, concluding that the defendants' actions "were performed exclusively in the State of Missouri" and, accordingly, there was "no nexus between Defendants' contacts with Utah and Plaintiff's claims," and the court of appeals affirmed.[24] We reversed and remanded.[25]

¶ 13 In reversing the court of appeals, we adopted a broad formulation of the "effects" test. We first discussed *Calder*, where jurisdiction in California was appropriate because "California [was] the focal point both of the [defamatory] story and of the harm suffered."[26] We did not discuss any of the specific contacts that were present in *Calder*, such as the extensive circulation of the magazine in California or the defendants' use of California sources in writing the story. We noted only that the defendants in that case "did not go to California to work on the story."[27] We summarized *Calder* as permitting jurisdiction "[b]ecause the reporters knew that their tort would cause harm in California."[28]

¶ 14 We then reviewed the "effects" test derived from *Calder*, which "may be satisfied if the defendant is alleged to have (1) committed an intentional act; (2) expressly aimed at the forum state; (3) causing harm, the brunt of which is suffered — and which the defendant knows is likely to be suffered — in the forum state."[29] In describing how these prongs could be satisfied, we discussed a Ninth Circuit case, *Harris Rutsky & Co. Insurance Services v. Bell &*

---

[23] *Id.* ¶¶ 4–6.

[24] *Id.* ¶¶ 6–7.

[25] *Id.* ¶ 31. We did not actually determine that jurisdiction was proper because we had announced a new standard for determining personal jurisdiction in conspiracy cases and remanded for further proceedings. We also reversed the trial court and court of appeals' conclusion that our long-arm statute did not permit jurisdiction, an issue not raised in this case. *See id.* ¶¶ 12–22.

[26] *Id.* ¶ 26 (quoting *Calder*, 465 U.S. at 789).

[27] *Id.*

[28] *Id.*

[29] *Id.* ¶ 27 (quoting *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1131 (9th Cir. 2003)).

*Clements Ltd.*[30] In that case, the second prong of the effects test—whether the defendant "expressly aimed" conduct at the forum state—was satisfied because "the defendants knew that the plaintiff corporation was a California resident, and so the alleged acts were expressly aimed at California."[31] The third prong—whether the brunt of the harm was suffered in the forum state—was also satisfied because "the plaintiff was a California corporation with its principal place of business in California, and the brunt of the harm was therefore felt in California."[32]

¶ 15 Thus, although our formulation of the "effects" test focused on a defendant's connections to the forum state, our description of how the test could be satisfied centered on a defendant's connections with a plaintiff who resided in the forum state. *Pohl*'s broad interpretation of *Calder* and the "effects" test permitted jurisdiction over a defendant so long as the defendant's tortious act targeted a plaintiff known to be a resident of the forum and the injury was suffered by the plaintiff in the forum state.[33] Although we did not apply this test to the defendants in *Pohl*, we did hold that the defendants' actions—none of which took place in Utah and none of which had any impact in Utah other than the alleged injury to the plaintiff—could potentially satisfy the minimum contacts analysis.[34]

---

[30] 328 F.3d 1122 (9th Cir. 2003).

[31] *Pohl*, 2008 UT 89, ¶ 27.

[32] *Id.*

[33] *See id.* ¶ 25 ("The premise of the conclusion reached by both the court of appeals and the trial court was that because all of the defendants' allegedly tortious actions took place in Missouri, no minimum contacts existed. This approach erroneously ignores the fact that a tort is incomplete without an injury, and thus the place of injury is an important component of the minimum contacts analysis. Moreover, 'within the rubric of "[purposeful] availment" the Court has allowed the exercise of jurisdiction over a defendant whose only "contact" with the forum state is the "purposeful direction" of a *foreign* act having *effect* in the forum state.'" (citation and footnote omitted)).

[34] *See id.* ¶ 32 ("[W]e believe that jurisdiction can be established over the defendants under the *Calder* 'effects' test by showing that the defendants were engaged in a conspiracy that was expressly aimed at Utah and that the conspiracy caused harm in Utah . . . .").

(Continued)

Ultimately, *Pohl* suggests that there is no need to examine whether the defendant had any contacts with the forum state besides the injury felt by the plaintiff, because any intentional tort committed against a resident of a forum state can be of itself a sufficient minimum contact. The question before us today is whether, post-*Walden*, this formulation of *Calder* and the "effects" test remains viable.

### 3. *Walden v. Fiore*

¶ 16 In *Walden*, the Supreme Court was asked "to decide whether a court in Nevada may exercise personal jurisdiction over a defendant on the basis that he knew his allegedly tortious conduct in Georgia would delay the return of funds to plaintiffs with connections to Nevada."[35] The plaintiffs were professional gamblers who, when returning from a gambling trip in Puerto Rico with almost $100,000 in cash, were stopped by Mr. Walden, a DEA agent, in Georgia.[36] Mr. Walden seized the money and, after plaintiffs returned to Nevada, allegedly drafted and submitted a false probable cause affidavit.[37] Plaintiffs filed a *Bivens* suit against Mr. Walden in Nevada, seeking money damages for the alleged violation of their Fourth Amendment rights.[38] The federal district court dismissed the suit, concluding "that [Mr. Walden's] search of [plaintiffs] and his seizure of the cash in Georgia did not establish a basis to exercise personal jurisdiction in Nevada," because the fact that "petitioner caused harm to respondents in Nevada while knowing they lived in Nevada" was insufficient to confer jurisdiction.[39] The Ninth Circuit reversed, holding that Mr. Walden "'expressly aimed' his submission of the allegedly false affidavit at Nevada by submitting the affidavit with knowledge that it would

---

Justice Wilkins dissented from the majority opinion on essentially these grounds. *See id.* ¶ 35 (Wilkins, J., dissenting) ("In this matter, the actions complained of, while clearly impacting the Utah plaintiff, just as clearly occurred in Missouri. None of the acts complained of occurred in Utah.").

[35] 134 S. Ct. at 1119.

[36] *Id.*

[37] *Id.* at 1119–20.

[38] *Id.* at 1120.

[39] *Id.*

affect persons with a 'significant connection' to Nevada"[40] — the same "effects" test we adopted from the Ninth Circuit in *Pohl*.

¶ 17 The Supreme Court then reversed the circuit court's decision, holding that the Ninth Circuit's approach "impermissibly allows a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis."[41] The Court, eschewing a rigid test, looked to "[t]wo related aspects" of "the relationship among the defendant, the forum, and the litigation" to determine jurisdiction[42]: whether "the relationship . . . arise[s] out of contacts that the 'defendant *himself*' creates," and whether those contacts are "with the forum State itself, not . . . with persons who reside there."[43] The first aspect means that jurisdiction cannot be predicated "on the 'unilateral activity' of a plaintiff."[44] And the second means that "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction."[45] Indeed, the Court repeatedly emphasized that "the plaintiff cannot be the only link between the defendant and the forum."[46]

¶ 18 The Court turned to *Calder* as an example of these principles.[47] It stated that, "[a]lthough we recognized that the defendants' activities 'focus[ed]' on the plaintiff, our jurisdictional inquiry . . . examined the various contacts the defendants had created with California (and not just with the plaintiff) by writing the allegedly libelous story."[48] The Supreme Court clarified that jurisdiction in *Calder* was possible not because the plaintiff suffered an injury while residing in California, but because "the injury to the plaintiff's reputation *in the estimation of the California public*" necessarily "connected the defendants' conduct to *California*, not just

---

[40] *Id.*

[41] *Id.* at 1125.

[42] *Id.* at 1121–22 (citation omitted).

[43] *Id.* at 1122 (citation omitted).

[44] *Id.* at 1123 (citation omitted).

[45] *Id.*

[46] *Id.* at 1122.

[47] *Id.* at 1123.

[48] *Id.* (second alteration in original) (citation omitted).

to a plaintiff who lived there."[49] "The strength of that connection was largely a function of the nature of the libel tort," which requires "publication to third persons."[50] "That connection, combined with the various facts that gave the article a California focus," such as the plaintiff's work as a California television entertainer and the defendants' reliance on California sources in writing the story, permitted jurisdiction.[51] Thus, at least according to the Supreme Court in *Walden*, "*Calder* made clear that mere injury to a forum resident is not a sufficient connection to the forum."[52]

¶ 19 After clarifying *Calder*'s holding, the Court looked to the facts of the case before it, stating that "no part of [Mr. Walden's] course of conduct occurred in Nevada."[53] Mr. Walden "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada."[54] Thus, Mr. Walden "formed no jurisdictionally relevant contacts with Nevada" because none of the "*defendant*'s actions connect him to the *forum*."[55]

¶ 20 The Court then directed its attention to the Ninth Circuit's use of the "effects" test—the same broad test we adopted in *Pohl*. In so doing, the Court gave guidance on how the second and third prong of the test should be employed. First, as to "express aiming," the Court rejected the Ninth Circuit's finding of minimum contacts based on Mr. Walden's "direct[ion] [of] his conduct at plaintiffs whom he knew had Nevada connections."[56] According to the Court, the Ninth Circuit's approach "improperly attributes a plaintiff's forum connections to the defendant and makes those connections 'decisive' in the jurisdictional analysis."[57] Thus, the Court clarified that the "express aiming" prong of the "effects" test could not be satisfied simply by showing that the defendant targeted an entity known to be a resident of the forum.

---

[49] *Id.* at 1124 (first emphasis added).

[50] *Id.*

[51] *Id.*

[52] *Id.* at 1125.

[53] *Id.* at 1124.

[54] *Id.*

[55] *Id.*

[56] *Id.* at 1125.

[57] *Id.*

¶ 21 Then, as to the "brunt of the injury" prong, the Court rejected the plaintiffs' argument that jurisdiction was proper because they "suffered the 'injury' caused by [Mr. Walden's] allegedly tortious conduct . . . while they were residing in the forum."[58] It explained that "an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State."[59] And in that case, the plaintiffs' injury was "not the sort of effect that is tethered to Nevada in any meaningful way," as the injury was felt in Nevada "not because anything independently occurred there, but because Nevada is where respondents chose to be" when the injury occurred.[60] Thus, "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."[61]

¶ 22 *Walden*'s interpretation of *Calder* and discussion of the appropriate minimum contacts analysis has significantly narrowed the broadly formulated "effects" test we adopted in *Pohl*.[62] As discussed, our decision in *Pohl* adopted a broad interpretation of the "effects" test that permitted jurisdiction solely on the basis of a defendant's connections with a plaintiff who resided in the forum state. Although it may still be true that jurisdiction can be premised on the defendant's "'purposeful direction' of a foreign act having effect in the forum state,"[63] *Walden* has clarified that the "effect in the forum state" must be more than an effect on a plaintiff in the forum state. Other courts faced with this question have come to the same conclusion.[64] Thus, although *Walden* did not overrule *Calder*, it

---

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] *See Pohl*, 2008 UT 89, ¶¶ 26–27.

[63] *Id.* ¶ 25 (emphases omitted) (citation omitted).

[64] *See, e.g.*, *Maxitrate Tratamento Termico E Controles v. Super Sys., Inc.*, 617 Fed. Appx. 406, 408 (6th Cir. 2015) ("Hedman relies on language in *Calder* suggesting that, if a defendant knows that its intentional acts will cause effects in a state, then that state can exercise jurisdiction over the defendant. . . . But the Supreme Court rejected that theory of personal jurisdiction (and that interpretation of *Calder*) last year in *Walden*." (citation omitted)); *Advanced Tactical*

(Continued)

clarified that the effects of an alleged tort must be felt by more than just a plaintiff with significant contacts with the forum state—they must be felt in some broader sense by the forum state itself, as was the case with the defamatory story in *Calder*.[65] Under *Walden*, the proper application of the "effects" test looks beyond both the plaintiff's connections to the forum state and the plaintiff's injury to whether the defendant has "create[d] a substantial connection with the forum State."[66]

¶ 23 Thus, to the extent that *Pohl* adopted an interpretation of *Calder* that permitted a plaintiff to be "the only link between the defendant and the forum," its interpretation is inconsistent with *Walden*.[67] Instead, we must look to whether the defendant has minimum contacts with Utah, not just with a plaintiff residing in Utah. We turn now to the application of these principles to the facts of this case.

### B. Under Walden*'s Clarified Interpretation of* Calder*, Revolabs Lacks Sufficient Minimum Contacts with Utah to Subject It to Specific Personal Jurisdiction*

¶ 24 Having discussed how *Pohl*'s broad formulation of the "effects" test has been narrowed by the Supreme Court's decision in *Walden*, we turn now to a discussion of whether, under *Walden*, Revolabs should be subject to personal jurisdiction in Utah. We conclude that because Revolabs's only alleged contact with Utah is the effects its alleged tortious conduct had on ClearOne, and because the alleged tort does not otherwise create meaningful contacts with Utah, Revolabs is not subject to personal jurisdiction in Utah.

---

*Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 802 ("[A]fter *Walden* there can be no doubt that 'the plaintiff cannot be the only link between the defendant and the forum.' . . . Any decision that implies otherwise can no longer be considered authoritative." (citation omitted)).

[65] *See Maxitrate*, 617 Fed. Appx. at 408–09; *see also Picot v. Weston*, 780 F.3d 1206, 1214–15 (9th Cir. 2015) (holding that there was no jurisdiction because the tort connected the defendant only to the plaintiff, not the forum).

[66] *Walden*, 134 S. Ct. at 1121.

[67] *Id.* at 1122–23 ("[A] defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction.").

¶ 25 As stated, in order for a court to exercise personal jurisdiction over a defendant, the defendant must have "minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"[68] In the context of an intentional tort, we apply the "effects" test, which looks to whether "the defendant is alleged to have (1) committed an intentional act; (2) expressly aimed at the forum state; (3) causing harm, the brunt of which is suffered—and which the defendant knows is likely to be suffered—in the forum state."[69]

¶ 26 When applying the "effects" test, however, we must keep in mind the two guiding principles of *Walden*: whether "the relationship [between the defendant, the litigation, and the forum] . . . arise[s] out of contacts that the 'defendant *himself*' creates," and whether those contacts are "with the forum State itself, not . . . with persons who reside there."[70] The Court in *Walden* repeatedly cautioned that "the plaintiff cannot be the only link between the defendant and the forum,"[71] "a plaintiff's contacts with the defendant and forum [cannot] drive the jurisdictional analysis,"[72] and "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."[73] Further, the Court "reiterate[d] that the 'minimum contacts' inquiry principally protects the liberty of the nonresident defendant, not the interests of the plaintiff."[74] Applying these principles to the case at hand, we conclude that Revolabs has not created any jurisdictionally relevant contacts with Utah and cannot be subject to personal jurisdiction here.

¶ 27 The relevant facts are these: ClearOne is a Utah corporation with its principal place of business in Utah. ClearOne and Mr. Mackie entered into an employment contract for a technical sales position that was governed by Utah law, though ClearOne has not

---

[68] *Int'l Shoe*, 326 U.S. at 316 (citation omitted).

[69] *Pohl*, 2008 UT 89, ¶ 27 (citation omitted).

[70] *Walden*, 134 S. Ct. at 1122 (citation omitted).

[71] *Id.*

[72] *Id.* at 1125.

[73] *Id.*

[74] *Id.* at 1125 n.9.

identified the location where this contract was executed. ClearOne has also not described the location or region in which Mr. Mackie worked and sold ClearOne products, except for a reference to a trade show located in Texas. It is clear, however, that during the time period relevant to the complaint, Mr. Mackey resided in Texas. While residing (and presumably working) in Texas, Mr. Mackie contacted Revolabs about the possibility of working for it instead of ClearOne. A number of conversations and other communications followed, exchanged between Mr. Mackie (in Texas) and Mr. Singleton (in Georgia), Mr. Cremer (in Massachusetts), Mr. Kleman (in California), and Mr. McGarry (in Massachusetts). As a result of these communications, Mr. Mackie eventually resigned from ClearOne and began working for Revolabs outside of Utah, which ClearOne alleges was in violation of Mr. Mackie's duties under the contract and as a fiduciary of ClearOne. These actions—the alleged interference with a Utah contract and employment relationship—are the only contacts that Revolabs is alleged to have with Utah as it relates to ClearOne's claims.

¶ 28 Under these facts, we do not see any way in which Revolabs expressly aimed its actions at Utah such that it created sufficient minimum contacts with the state. ClearOne has not alleged that Revolabs was attempting to "enter[] a contractual relationship that 'envisioned continuing and wide-reaching contacts'" in Utah, nor that it was "'deliberately exploi[ting]' a market" in Utah.[75] ClearOne has also not alleged that Revolabs physically entered Utah "in person or through an agent, goods, mail, or some other means."[76] To be sure, ClearOne has alleged that Revolabs intentionally injured ClearOne with full knowledge that ClearOne was a Utah corporation. But the Supreme Court has expressly rejected knowledge of a plaintiff's forum connections as a sufficient jurisdictional basis.[77] To permit jurisdiction because of these

---

[75] *Id.* at 1122 (citations omitted).

[76] *Id.*

[77] *Id.* at 1124–25 ("Rather than assessing petitioner's own contacts with Nevada, the Court of Appeals looked to petitioner's knowledge of respondents' 'strong forum connections.' In the court's view, that knowledge, combined with its conclusion that respondents suffered foreseeable harm in Nevada, satisfied the 'minimum contacts' inquiry. This approach to the 'minimum contacts' analysis impermissibly allows a plaintiff's contacts with the defendant and

(Continued)

allegations would return to the broad interpretation of the "effects" test that was rejected in *Walden*.[78]

¶ 29 As to the "brunt of the injury" prong, the alleged injury resulting from Revolabs's alleged conduct "is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State."[79] Otherwise, "mere injury to a forum resident is not a sufficient connection to the forum."[80] In *Calder*, the injury was jurisdictionally relevant because the publication of the allegedly libelous article necessarily connected the defendants to California.[81] As the Wyoming Supreme Court described, "the alleged wrongdoing, libel, was itself tied to the location into which the words were 'sent.'"[82] The question here is whether there is something "about the *nature* of the alleged [misconduct] . . . [that] inextricably links the misconduct to the *location* where the [injury was felt]."[83]

¶ 30 ClearOne argues that "the epicenter of the claims and injury in this case is Utah." But its description of how Revolabs's alleged misconduct is linked to Utah is instructive as to why jurisdiction is improper:

> Utah is the focal point not just because ClearOne is headquartered in Utah, but also because the employment contract that [Mr.] Mackie entered into with ClearOne was and is governed by Utah law,

forum to drive the jurisdictional analysis." (citation omitted) (footnote omitted)).

[78] *Id.* at 1122 ("We have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State.").

[79] *Id.* at 1125.

[80] *Id.*

[81] *Id.* at 1124 ("[T]he 'effects' caused by the defendants' article— *i.e.*, the injury to the plaintiff's reputation in the estimation of the California public—connected the defendants' conduct to *California*, not just to a plaintiff who lived there.").

[82] *State ex rel. State Treasurer of Wyo. v. Moody's Inv'rs Serv., Inc.*, 349 P.3d 979, 985 (Wyo. 2015) (citation omitted).

[83] *Id.*

required performance by ClearOne and [Mr.] Mackie (at least in part) in Utah. Moreover, [Mr.] Mackie's fiduciary obligations were created and governed by Utah law, were owed to a Utah company, and were to be fulfilled, in part, in Utah. Finally, ClearOne's predatory hiring claim is also subject to Utah law.

The only reason Revolabs's alleged misconduct is linked to Utah is because ClearOne unilaterally chose to execute a contract governed by Utah law, chose to incorporate in Utah, and chose to assert Utah causes of action. Although we accept as true ClearOne's allegation that the employment contract between ClearOne and Mr. Mackie was subject to Utah law, it seems clear that Mr. Mackie's actual work was not based in Utah, as the only description of the work Mr. Mackie performed relates to Texas, where he resided at all relevant times. Thus, although ClearOne has alleged that Revolabs tortiously interfered with an employment contract and fiduciary duties governed by Utah law, there are no allegations to support the conclusion that the employment relationship or Revolabs's alleged subversion of that relationship were inextricably linked to Utah in any other way besides ClearOne's presence here.

¶ 31 Indeed, the fact that the contract was made under Utah law is unavailing as the Supreme Court has held that "an individual's contract with an out-of-state party *alone* can[not] automatically establish sufficient minimum contacts in the other party's home forum."[84] By the same token, interference with a contract based in another state is likewise insufficient without any other contact linking the defendant to the forum state. And the only other relevant contacts ClearOne suggests that Revolabs has all turn on the Utah contacts of ClearOne and Mr. Mackie. This type of connection is insufficient under *Walden*.[85] Revolabs must have contacts "with the forum State itself, not . . . with persons who reside there."[86]

---

[84] *Walden*, 134 S.Ct. at 1122–23 (citation omitted).

[85] *Id.* at 1122 ("We have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State."); *see also id.* at 1123 ("[I]t is . . . insufficient to rely on a defendant's 'random, fortuitous, or attenuated contacts' or on the 'unilateral activity' of a plaintiff." (citation omitted)).

[86] *Id.* (citation omitted).

¶ 32 The Ninth Circuit confirmed this understanding in *Picot v. Weston*, a recent, post-*Walden* case dealing with a similar claim of tortious interference.[87] In that case, Mr. Picot attempted to sue Mr. Weston in California and accused Mr. Weston of "making statements to [Mr.] Coats (an Ohio resident) that caused HMR (a Delaware corporation with offices in Ohio) to cease making payments into two trusts (in Wyoming and Australia)."[88] "[Mr.] Weston did all this from his residence in Michigan, without entering California, contacting any person in California, or otherwise reaching out to California."[89] The Ninth Circuit, quoting *Walden*, stated that "[i]n short, 'none of [Mr.] [Weston's] challenged conduct had anything to do with [California] itself'" and found jurisdiction improper.[90] As discussed, the same analysis and result is present here.

¶ 33 Ultimately, Revolabs's conduct had little to do with Utah, even though it had a lot to do with ClearOne. There is nothing other than ClearOne's contract and the fact that ClearOne happens to be incorporated here that links Revolabs to Utah. And ClearOne's unilateral activity—choosing to incorporate in Utah and maintain its principal place of business in Utah—is an insufficient basis for jurisdiction.[91] As ClearOne's counsel acknowledged during oral argument, to hold otherwise would subject Revolabs to jurisdiction wherever ClearOne chose to incorporate. Such a result would "impermissibly allow[] [ClearOne's] contacts with the defendant and forum to drive the jurisdictional analysis."[92] As *Walden* made clear, "the plaintiff cannot be the only link between the defendant and the forum."[93] Accordingly, because Revolabs does not have sufficient minimum contacts with Utah, we affirm the trial court's decision on this point.

---

[87] 780 F.3d 1206, 1214–15 (9th Cir. 2015).

[88] *Id.* at 1215.

[89] *Id.*

[90] *Id.* (third and fourth alteration in original).

[91] *See Walden*, 134 S. Ct. at 1123.

[92] *Id.* at 1125.

[93] *Id.* at 1122.

## II. ClearOne Has Not Provided Sufficient Evidence that Revolabs Could Be Subject to General Personal Jurisdiction to Warrant Jurisdictional Discovery

¶ 34 ClearOne's second argument is that, even if Revolabs is not subject to specific personal jurisdiction, ClearOne should have the opportunity to conduct discovery in order to determine whether Revolabs should be subject to general personal jurisdiction. Unlike specific personal jurisdiction, "[g]eneral personal jurisdiction permits a court to exercise power over a defendant without regard to the subject of the claim asserted,"[94] and is thus also known as "all-purpose" personal jurisdiction. Because ClearOne has failed to "present facts to the court which show why jurisdiction would be found if discovery were permitted"[95] under the standard the Supreme Court has set forth, we affirm the trial court's denial of ClearOne's request for discovery. We first address the standard for reviewing a denial of jurisdictional discovery, then discuss the standard for determining general jurisdiction, and end by explaining how the discovery sought by ClearOne would not provide a sufficient basis for general jurisdiction.

¶ 35 A court "may determine jurisdiction on affidavits alone, permit discovery, or hold an evidentiary hearing."[96] But the party seeking discovery has "the obligation to present facts to the court which show why jurisdiction would be found if discovery were permitted."[97] Further, the denial of a request to conduct discovery is reviewed for abuse of discretion, and "[a]n appellate court will not interfere with the trial court's refusal to grant discovery except upon the clearest showing that the dismissal resulted in actual and substantial prejudice to the litigant."[98] Denying jurisdictional discovery "is not an abuse of discretion when it is clear that further

---

[94] *Pohl, Inc. of Am. v. Webelhuth*, 2008 UT 89, ¶ 9, 201 P.3d 944 (citation omitted).

[95] *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 626 (1st Cir. 2001).

[96] *Anderson v. Am. Soc'y of Plastic & Reconstructive Surgeons*, 807 P.2d 825, 827 (Utah 1990).

[97] *Swiss Am. Bank*, 274 F.3d at 626.

[98] *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977).

discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction."[99]

¶ 36 The question, then, is whether the facts that ClearOne might discover if its request was granted would provide a sufficient basis for general jurisdiction. The United States Supreme Court recently clarified in *Daimler AG v. Bauman* the level of contact with a state a party must have in order to permit the state to exercise general or "all-purpose" jurisdiction over the party.[100] In *Daimler*, Argentinian residents filed a complaint in a California federal district court attempting to sue DaimlerChrysler Aktiengesellschaft (Daimler), a German public stock company that manufactures Mercedes-Benz vehicles in Germany.[101] The plaintiffs argued that "the California contacts of Mercedes-Benz USA, LLC (MBUSA), a subsidiary of Daimler incorporated in Delaware with its principal place of business in New Jersey," could be attributed to Daimler and thereby permit general jurisdiction to be exercised over Daimler in California.[102] MBUSA's California contacts consisted of "multiple California-based facilities," including a regional office, and a high volume of sales of Daimler vehicles.[103]

¶ 37 The Supreme Court, "assum[ing] MBUSA's contacts [were] imputable to Daimler," held that there was "no basis to subject Daimler to general jurisdiction in California, for Daimler's slim contacts with the State hardly render it at home there."[104] This was a reaffirmation that general jurisdiction is appropriate only when a

---

[99] *Id.*

[100] 134 S. Ct. 746, 760–62 (2014).

[101] *Id.* at 750–51. The complaint alleged that Daimler collaborated with Argentinian state security forces during Argentina's "Dirty War" in order to kidnap, detain, torture, and kill the plaintiffs or close relatives of the plaintiffs. *Id.* at 751.

[102] *Id.* at 751–52.

[103] *Id.* at 752. MBUSA was "the largest supplier of luxury vehicles to the California market," and its California sales accounted for "over 10% of all sales of new [Daimler] vehicles in the United States" and "2.4% of Daimler's worldwide sales." *Id.*

[104] *Id.* at 760. The Supreme Court assumed but did not decide whether MBUSA's contacts with California were sufficient to establish general personal jurisdiction over MBUSA. *Id.* at 758.

"corporation's 'affiliations with the State are so "continuous and systematic" as to render [it] essentially at home in the forum State.'"[105] In so holding, the Court expressly rejected the "doing business" test, which purported to subject a corporation to general jurisdiction "in every State in which a corporation 'engages in a substantial, continuous, and systematic course of business.'"[106] Instead, the Court clarified that a defendant's contacts with the state must be so extensive as to be "comparable to a domestic enterprise in that State,"[107] with the paradigmatic examples being a corporation's "place of incorporation and principal place of business."[108] Although the Court did "not foreclose the possibility that in an exceptional case"[109] a company could be considered "at home" elsewhere, it cautioned that "[a] corporation that operates in many places can scarcely be deemed at home in all of them."[110] Thus, despite the significant number of facilities located in California and amount of

---

[105] *Id.* at 761 (alteration in original) (citation omitted).

[106] *Id.* at 760–61 (citation omitted). The Court called this formulation of the general jurisdiction test "unacceptably grasping." *Id.* at 761.

[107] *Id.* at 758 n.11.

[108] *Id.* at 760.

[109] *Id.* at 761 n.19. The case cited by the Supreme Court as an "exceptional case," *Perkins*, is instructive, as it is both "exceptional" and the only case decided by the Supreme Court permitting general jurisdiction. *See id.* at 756 & n.8 (discussing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952)). In *Perkins*, the defendant company was incorporated and had its principal place of business in the Philippines until it was forced to suspend its operations during World War II. *Perkins*, 342 U.S. at 448. During the war, the president of the company moved to Ohio, where he kept an office, maintained the company's files, and oversaw the company's activities. *Id.* As the Supreme Court explained, general jurisdiction was possible "because 'Ohio was the corporation's principal, if temporary, place of business.'" *Daimler*, 134 S. Ct. at 756 (citation omitted). *See also id.* at 756 n.8 (confirming that the company in *Perkins* was "at home" in Ohio because "[t]o the extent that the company was conducting any business during and immediately after the Japanese occupation of the Philippines, it was doing so in Ohio" and "Ohio was the center of the corporation's wartime activities").

[110] *Daimler*, 134 S. Ct. at 762 n.20.

business transacted in California, such activity was insufficient to consider Daimler "at home" in California.

¶ 38 When ClearOne's request for discovery is viewed in the light of the high standard for general personal jurisdiction set by the United States Supreme Court, it is clear that further discovery could not lead to "facts sufficient to constitute a basis for jurisdiction." Indeed, the Supreme Court stated that "it is hard to see why much in the way of discovery would be needed to determine where a corporation is at home."[111] This is true because, as ClearOne concedes, the question of general personal jurisdiction turns on whether the in-state activities of a company—Revolabs in this case— "closely approximate the activities that ordinarily characterize a corporation's place of incorporation or principal place of business."[112] The facts and allegations provided by ClearOne fall far short of this level of activity.

¶ 39 The facts alleged by ClearOne in support of its claim of jurisdiction are that Revolabs has a publicly accessible website, that Revolabs is included in an online directory of Utah businesses maintained by the Utah Department of Workforce Services—though the site states that Revolabs currently has no employees in Utah— and that Utah Valley University issued a bid solicitation for audio-visual equipment, including equipment sold by Revolabs. ClearOne has not, however, contradicted Revolabs's affidavit statement that "Revolabs does not maintain or conduct any business operations in the state of Utah and does not direct any advertising into Utah; it has no offices in Utah, owns no property in Utah[,] and maintains no employees in Utah." ClearOne's only response is that discovery may reveal that Revolabs gains revenue from Utah, that Revolabs may be party to Utah contracts, or that Revolabs may have conducted business prior to litigation—facts that ClearOne argues are suggested by Revolabs's website, the online directory, and the bid solicitation.

---

[111] *Id.*; *see also id.* at 760 (setting place of incorporation and principal place of business as paradigm bases for general jurisdiction because "[t]hose affiliations have the virtue of being unique . . . as well as easily ascertainable").

[112] *Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1205 (11th Cir. 2015).

¶ 40 The problem with ClearOne's argument is that it claims general jurisdiction could be predicated on Revolabs's potentially "substantial and continuous business activity in Utah." This "doing business" approach to general jurisdiction, however, was expressly considered and flatly rejected by the Supreme Court as part of its holding in *Daimler*.[113] Indeed, activity exponentially more extensive than what ClearOne suggests Revolabs may be engaged in was considered "slim" in *Daimler*, and "plainly [did] not approach" the level of association necessary for general jurisdiction.[114] "A corporation's 'continuous activity of some sort[] within a state . . . is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.'"[115] The limited number of Supreme Court cases on this point clearly require something more than just some revenue or contracts to qualify the company as "at home" in that state.[116]

---

[113] *See Daimler*, 134 S. Ct. at 760–61 ("Plaintiffs would have us look beyond the exemplar bases [of place of incorporation and principal place of business] and approve the exercise of general jurisdiction in every State in which a corporation 'engages in a substantial, continuous, and systematic course of business.' That formulation, we hold, is unacceptably grasping." (citation omitted)).

[114] *Id.* at 760, 761 n.19.

[115] *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2856 (2011) (citation omitted).

[116] *Compare Daimler*, 134 S. Ct. at 756 n.8 (general jurisdiction present in *Perkins* because "Ohio was the center of the corporation's wartime activities"), *with id.* at 752 (no general jurisdiction when company had "multiple California-based facilities, including a regional office," and had a significant volume of sales in California), *Goodyear*, 131 S. Ct at 2852 (no general jurisdiction when companies "ha[d] no place of business, employees, or bank accounts in North Carolina," did "not design, manufacture, or advertise their products in North Carolina," and did "not solicit business in North Carolina or themselves sell or ship [products] to North Carolina customers," even if "a small percentage of [the companies' products] . . . were distributed within North Carolina"), *and Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984) (no general jurisdiction when a company's "contacts with Texas consisted of sending its chief executive officer to Houston for a contract-negotiation session; accepting into its New York bank account checks drawn on a

(Continued)

¶ 41 The Supreme Court was clear that bases for general jurisdiction aside from the corporation's place of incorporation and principal place of business should be found only in exceptional cases, and this does not appear to be one. Indeed, as a matter of common sense, there are likely many companies that have no official operations in Utah that still derive some revenue from Utah consumers. It would strain the Supreme Court's standard for general jurisdiction beyond recognition to suggest that a company like Revolabs that has no business operations in a state can fairly be said to be "at home" there because of some potential revenue or contracts. Accordingly, because ClearOne has failed to show that discovery would lead to facts proving that Revolabs is "at home" in Utah, we hold that the trial court did not abuse its discretion in denying ClearOne's discovery request.

### Conclusion

¶ 42 The Supreme Court's recent cases provide clear guidance as to the issues that we address today. *Walden* has clarified *Calder*'s "effects" test and, under *Walden*, ClearOne has failed to allege that Revolabs has sufficient minimum contacts to subject it to specific personal jurisdiction in Utah. Revolabs's connection to ClearOne and Mr. Mackie is simply insufficient, on its own, to confer jurisdiction. As to general personal jurisdiction, the Supreme Court in *Daimler* clearly rejected the "doing business" test that was the basis for ClearOne's claim. As it is clear that no further discovery could lead to facts supporting general jurisdiction, the trial court did not abuse its discretion in denying ClearOne's motion. Accordingly, we affirm the trial court's decision as to both issues.

---

Houston bank; purchasing helicopters, equipment, and training services . . . ; and sending personnel to [Texas] for training").